## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

                    Plaintiff,

v.                                                      Cr.  No. 04-2026 JH

WILLIAM TODD CRAVEN,

                    Defendant.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant's *Motion to Suppress Semi-Automatic Pistol Seized from the Defendant's Residence* [Doc. No. 13].  On February 9, 2005, the Court held an evidentiary hearing on the motion.  Maureen Rudolph and Louis Valencia appeared on behalf of the United States, and Richard Winterbottom appeared on behalf of the Defendant, who was present. The primary issue before the Court is whether the owner of the residence voluntarily consented to the search of her home where the evidence against Defendant was found.  After carefully considering the testimony of the witnesses, the exhibits admitted into evidence, and the law, the Court concludes that the motion to suppress should be granted.

## FACTS

This case stems from Defendant's arrest in Albuquerque in the early morning hours of June 26, 2004.  Based upon the evidence presented at the evidentiary hearing on February 9, 2005, the Court makes the following findings of fact.

On June 25, 2004, Special Agents Raymond Montoya and Christopher Benavides of the Bureau of Alcohol, Tobacco, and Firearms ("ATF") were driving near Defendant's residence on

Trumbull Road in Albuquerque.  They were accompanied by a New Mexico State Probation Officer, Michael Bouska.  The threesome had a warrant for Defendant's arrest and a physical description of him.  Acting on a report from another probation officer that Defendant could be found in the area, the three drove to Trumbull Road to look for him.  They saw a car with Connecticut license plates that they believed might belong to Defendant and attempted to follow it, but lost sight of it.  Later that evening at approximately 11:30 p.m., they returned to the same neighborhood.  While driving in Bouska's unmarked car, they saw a man matching Defendant's description arguing with a woman (later identified to be Defendant's fiancé at the time, Kimberly Hull) outside a home on Trumbull Road near a park.  The ATF agents called the Albuquerque Police Department ("APD") for assistance.  While they were waiting for APD to arrive, the federal agents saw the Defendant and Ms. Hull walk to a park across the street from the home.  In the meantime, the federal agents parked on the street on the opposite side of the park from where Defendant and Ms. Hull were seated on a park bench and observed them with binoculars.

Sometime thereafter, APD Officer Daniel Pfel and another unnamed APD officer arrived in their marked police car.  The two APD officers, who were in uniform, parked their car and approached Defendant and Ms. Hull on foot.  They then asked the pair for their names.  Defendant gave the officers a false name.  Next, the officers asked Defendant to provide some identification.  Defendant was fairly cooperative, but he said that he had no identification with him because he had left his wallet in his house.

In the meantime, both ATF agents and Probation Officer Bouska had gotten out of their car and walked through the park toward Defendant, Ms. Hull, and the APD officers. Defendant was facing Officer Pfel, but the federal agents and Probation Officer Bouska (who were in plainclothes)

2

approached Defendant and Ms. Hull from behind, at which point they were surrounded by five law enforcement officers.  Agent Montoya could see tattoos on Defendant's arm that matched those in the description of the William Craven for whom there was a pending arrest warrant.  Agent Montoya could also see that, contrary to Defendant's statement, he in fact did have a wallet in his back pocket. Probation Officer Bouska also asked Defendant to identify himself and then attempted to place handcuffs on the Defendant, which resulted in a struggle.  Ultimately, the law enforcement officers forced Defendant to the ground in order to restrain him.  Shortly before 11:55 p.m., they placed Defendant under arrest and read him his rights.  Defendant then admitted, "I am the one you are looking for."  With Defendant's permission, Agent Montoya looked in Defendant's wallet, where he found a driver's license bearing the name of William Craven.  Agent Montoya then asked Defendant if he had any firearms on his person, in his car, or in his home, which Defendant  denied.  Agent Montoya formed the opinion that Defendant was not being truthful.   Defendant  then gave Agent Benavides consent to search his car.

In the meantime, when the physical struggle between Defendant and the federal agents began, Officer Pfel took Ms. Hull aside and walked her across the street to the front of her home. Officer Pfel asked Ms. Hull to identify the Defendant.  Initially, Ms. Hull also gave Officer Pfel a false name for Defendant.  At that point, Officer Pfel told Ms. Hull that Defendant was "wanted," that the other men were federal agents, and that she needed to tell the truth or she would be arrested for harboring a fugitive.  Ms. Hull then stated that Defendant's name was William Todd Craven.  Then, Agent Benavides asked Officer Pfel to join him in searching Defendant's car.  Agent Benavides and Officer Pfel walked away, at which point Ms. Hull was joined by Agent Montoya.

Agent Montoya asked Ms. Hull if Defendant had any firearms in the residence.  She initially

said no, but Agent Montoya believed that she was lying.  At that point, Agent Montoya told Ms. Hull

that she had been harboring a fugitive.  He also told Ms. Hull that if he went into the house and found

weapons that she had not told him about, she would be arrested for obstructing justice.  Then, Agent

Montoya unsnapped a pouch on his belt and took out his handcuffs, holding them in his hands, and

said "I'm going to ask you again, are there any firearms?", motioning as though he were going to

handcuff her.  At this time Ms. Hull admitted that Defendant did have a firearm in their bedroom.  At

some point, three children who were in the house were sent home with a family friend.      A g e n t

Montoya then asked Ms. Hull to show him where the firearm was, and she agreed.  Ms. Hull's

demeanor during this time was fearful but calm.  At no point did Agent Montoya or any other law

enforcement officer perform a frisk or "pat down" of Ms. Hull in order to determine if she had a

weapon on her person.  Agent Montoya and Ms. Hull then entered the house.  Ms. Hull pointed out

the doorway to the master bedroom, which was only a short distance from the main entrance to the

home.[1]  Holding his flashlight, Agent Montoya went into the bedroom, where he saw the butt of a

gun showing from beneath a pillow and a black baseball cap.  During this time Ms. Hull was standing

in the doorway to the master bedroom, and she did not tell Agent Montoya that he could not enter

her bedroom.

       Agent Benavides requested that an APD field investigator come photograph, identify, and

properly secure the gun found by Agent Montoya.  While they were waiting for the field investigator

to arrive, Agent Montoya stood in the doorway to the house to prevent anyone else from gaining

access to the gun.  Agent Montoya also testified that he "might have" entered the bedroom, unloaded

---

[1] Agent Montoya's report does not state that Ms. Hull gave him verbal consent to enter
her home before he crossed the threshold in search of the gun.

the gun, and then left it in its original place.  Also during that time frame, Agent Montoya and Agent Benavides talked with Ms. Hull near the doorway to her house.  She told them about her past problems with Defendant, including his physical abuse of her and his use of illegal drugs.  She also stated that Defendant had obtained the gun from friends approximately two weeks earlier, and that earlier that evening he had threatened to use the gun to commit suicide.  During this time the agents were not aggressive with Ms. Hull, whose demeanor was fragile and emotional, though not hysterical.

Finally, after about 30 minutes the law enforcement officers received word that the field investigator was not coming to Defendant and Ms. Hull's home.  Accordingly, they decided to write out a "consent to search form," because none of them had a pre-printed form with them.  While sitting in Ms. Hull's small kitchen, Agent Benavides wrote out the consent form, which reads as follows:

> Date: 06-26-04 (Friday) (Saturday)
> Time: 12:20 p.m.
> I hereby Kimberly Hull give authorization to local and federal law enforcement officers to search all rooms inside of my residence located at 501 Trumbull Rd, Albuquerque, NM, and all conveyances (vehicles) and outbuildings located on the premises.

Defendant's Exhibit C.  Agent Montoya was also present in the kitchen while Agent Benavides wrote out the form.  Agent Benavides showed the form to Ms. Hull, and explained that it would give the police permission to search her entire house.  He then asked her if she was willing to sign it.  No one told Ms. Hull that she had the right to refuse consent or the right to require the law enforcement officers to obtain a search warrant.  Ms. Hull signed the document, and then Officer Pfel and Agent Montoya signed as witnesses.

At this point, it bears noting that there is a significant factual dispute regarding the timing of

events.  On the one hand, Agent Montoya testified that although he had already entered the bedroom and unloaded the gun, they actually seized the gun in the bedroom *after* Ms. Hull signed the handwritten consent form.  However, that testimony is contradicted by the documents admitted into evidence.  Specifically, the evidence tag filled out by Officer Pfel (Defendant's Exhibit B) states that he seized the gun at 12:09 a.m. on June 26, 2004. The handwritten consent form signed by Ms. Hull indicates that she signed that document sometime between 12:20 and 12:30 a.m.[2]  Officer Pfel's testimony on redirect examination appears to confirm that he seized the gun and tagged it as evidence before Ms. Hull signed the consent form.  Accordingly, the Court concludes that Officer Pfel seized the weapon after law enforcement officers entered Ms. Hull's home but prior to her signing the handwritten consent form.

After Ms. Hull signed the handwritten consent form, the agents and police conducted a search of the entire residence, including the master bedroom.[3]  Then, the agents and police left the home sometime after 1:00 a.m.   During the search, the officers found and seized a Makarov, 9/18 mm semi-automatic pistol from the master bedroom (the same weapon initially located by Agent Montoya), as well as ammunition, a Bank of Albuquerque receipt with the Defendant's name, and a TV Guide Magazine with the mailing label addressed to the Defendant.  The United States has

---

[2] The ambiguity stems from the fact that the consent form contains two notations of time. The first, at the top of the page, says "12:20 p.m."  Because these events took place in the early morning hours, the Court assumes (and Agent Montoya's testimony confirms) that this is an error and that in fact it was 12:20 a.m.  The second notation, "12:30 a.m.," is at the bottom of the page adjacent to Special Agent Montoya's signature.

[3] At the hearing, Ms. Hull testified that law enforcement officers searched the entire house first, and that she signed the consent form just before they left.  However, for the purpose of this Memorandum Opinion and Order it is not necessary for the Court to resolve this conflict between Ms. Hull's testimony and that of the government's witnesses.

indicted Defendant for being a felon in possession of a firearm.

## DISCUSSION

The Fourth Amendment generally prohibits the government from making a warrantless entry into a person's residence to search for specific objects. *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). This general rule has a few exceptions, however. "[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed.2d 854 (1973). Stated another way, "[t]he [Fourth Amendment] prohibition does not apply ... to situations in which voluntary consent has been obtained, either from the individual whose property is searched or from a third party who possesses common authority over the premises." *Rodriguez*, 497 U.S. at 181, 110 S. Ct. 2793 (citations omitted).

The government has the burden of proving valid consent to a warrantless search. *United States v. Cody*, 7 F.3d 1523, 1526 (10th Cir.1993). In *United States v. Rith*, 164 F.3d 1323, 1329 (10th Cir. 1999), the Tenth Circuit stated that "a third party has authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." *Id.* From the evidence and argument presented at the hearing, it appears that both Defendant and Ms. Hull resided at the residence on Trumbull Road, and therefore Ms. Hull's authority to give consent is not in question. Therefore, the focus of the inquiry is the timing and voluntariness of the consent Ms. Hull gave to law enforcement officers to enter and search her home.

## I.     THE INITIAL VERBAL CONSENT BY MS. HULL

The first issue before the Court is whether the Government has met its burden of proving that Ms. Hull voluntarily gave verbal consent to Agent Montoya to enter her home in order to locate weapons.  "Whether consent is voluntary is to be determined by examining the totality of the circumstances, including the interaction between the police and the person alleged to have given consent." *Id*.  The Tenth Circuit has utilized a two-part test to make this determination: "First, the government must proffer 'clear and positive testimony that consent was unequivocal and specific and freely given.' Furthermore, the government must prove that this consent was given without implied or express duress or coercion."  *See United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996) (quoting *United States v. Angulo-Fernandez*, 53 F.3d 1177, 1180 (10th Cir.1995)).

"In determining whether a consent to search is voluntary, a court should consider the following: physical mistreatment, use of violence or threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant." *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir. 1994).  Other factors tending to show that consent was coerced include the presence of more than one officer, the display of weapons, physical touching, and use of an aggressive tone. *United States v. Turner*, 928 F.2d 956, 959 (10th Cir. 1991).  In all, the court should consider whether the officer's conduct constituted a coercive show of authority, such that a reasonable person would believe he was not free to "decline the officer's requests or otherwise terminate the encounter." *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000) (quotation omitted).

After considering the facts and the legal principles outlined above, the Court concludes that the totality of the circumstances show that Ms. Hull's initial verbal consent was not voluntary.

Although there is no evidence that Agent Montoya or any of the other law enforcement officers present at the scene mistreated Ms. Hull or used physical force against her, there is substantial evidence of coercion.  First, the sheer number of law enforcement officers present at the scene—two uniformed APD officers, one plain clothed APD parole officer, and two plain clothed ATF agents—and the manner in which they suddenly appeared and surrounded Ms. Hull and Defendant were factors contributing to the intimidation felt by Ms. Hull.  Second, the tone used by Agent Montoya, which Ms. Hull described as "kind of rough," also contributed to the coercive nature of their conversation.  Third, Agent Montoya told Ms. Hull that she had been harboring a fugitive and that she could be arrested if she did not cooperate, which statements were effectively a threat against Ms. Hull.  Fourth, when questioning Ms. Hull about the presence of weapons in her home, Agent Montoya pulled out his handcuffs and moved toward her as though he were going to arrest and handcuff her.  Taken together, the totality of these circumstances created a situation in which no reasonable person would believe that he was free to decline Agent Montoya's request to enter the home to search for a gun.

Agent Montoya testified that he felt that his actions were necessary in order to determine if there were weapons present at the scene so that he could assure officer safety.  As he stated at the February 9, 2005 hearing, "sometimes what they call or what defense may call coercion, or whatever, I consider is survival."  The Court is not unsympathetic to the safety concerns that law enforcement officials face every day in the course of their duties.  In fact, the Fourth Amendment does contain an exception to the warrant requirement that might have applied here: the protective sweep, which is a "quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276

(1990).  However, the protective sweep must be justified by a reasonable perception, based upon specific and articulable facts, that the area swept harbors an individual posing an immediate danger to the officers or others.  *Id*. at 334, 110 S.Ct. 1093; *United States v. Hogan*, 38 F.3d 1148, 1150 (10th Cir. 1994).

The Government has neither argued that it was entitled to do a protective sweep in this instance, nor has it pointed to specific, articulable facts justifying such a sweep under *Buie*.  Instead, the Government has argued only that it obtained prior verbal consent.  However, because the Government has not met its obligation to prove voluntariness by a preponderance of the evidence, the Court finds that Ms. Hull's consent was involuntarily given.  In addition, the concern for officer safety in this case is belied somewhat by the fact that no one performed a "pat down" on Ms. Hull to determine if she were carrying a weapon.  Furthermore, the Government has not pointed to objective, articulable facts supporting the urgency in searching the home for the presence of a weapon or dangerous person.  Although Agent Montoya testified that he "felt" that Ms. Hull was lying to him about the presence of a gun inside the home, that alone does not suffice under the standards set forth in *Buie*.

## II.   THE SUBSEQUENT WRITTEN CONSENT BY MS. HULL

Having found that Ms. Hull's initial acquiescence to Agent Montoya's request to enter her home was involuntary, the Court must now determine whether Ms. Hull's later written consent to search the entire home was valid.

Generally speaking, consent given *after* a search and seizure is not valid consent.  When an individual consents to a search after an illegal entry is made, the consent is not valid and "suppression is required of any items seized during the search..., unless the taint of the initial entry has been

10

dissipated before the 'consents' to search were given." *United States v. Buchanan*, 904 F.2d 349, 356 (6th Cir. 1990) (quoting *United States v. Vasquez*, 638 F.2d 507, 527 (2d Cir. 1980)).

Thus, it is necessary to decide if Ms. Hull's consent was "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Brown v. Illinois*, 422 U.S. 590, 599, 95 S.Ct. 2254, 2259, 45 L.Ed.2d 416 (1975) (emphasis in original) (quoting *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963)); *see also United States v. Wellins*, 654 F.2d 550, 553 (9th Cir. 1981); *United States v. Vasquez*, 638 F.2d 507, 527-29 (2d Cir. 1980). Dissipation of the taint resulting from an illegal entry "ordinarily involves showing that there was some significant intervening time, space, or event." *Vasquez*, 638 F.2d at 528.

A review of the evidence reveals no intervening event of significance between the time of the illegal entry and the time Ms. Hull signed the consent form. Less than one hour passed between the time the agents entered the house and the time Ms. Hull signed the written consent to search. *Cf. Vasquez*, 638 F.2d at 528 (passage of only "an hour or so" between entry and consent was not significant, but initial determination of dissipation issue left to district court). At the time she signed the consent form, Ms. Hull was seated in the kitchen of her house in the presence of several agents (Montoya, Benavides, and Pfel), one of whom had already been inside her bedroom. No one informed Ms. Hull of her right to refuse consent and insist upon a search warrant. *United States v. Iribe*, 11 F.3d 1553, 1559 (10th Cir. 1993) (affirming district court's finding that defendant's consent to search his garage was invalid where law enforcement did not inform defendant of his right to refuse consent). Moreover, Ms. Hull did not have the opportunity to consult with an attorney prior to consenting to the search. *Cf. Wellins*, 654 F.2d at 555 (opportunity to consult with attorney prior to giving consent was "crucial factor" in finding the taint of the illegal entry sufficiently attenuated).

11

Although none of these facts alone is dispositive, taken together they show that the taint of the initial coercion was not dissipated.

Having found that Ms. Hull's initial consent to search was the product of coercion, and that the taint of that coercion was not removed before she signed a written consent form, the Court concludes that the Defendant's motion to suppress should be granted.

IT IS THEREFORE ORDERED that Defendant's *Motion to Suppress Semi-Automatic Pistol Seized from the Defendant's Residence* [Doc. No. 13] is **GRANTED**.

UNITED STATES DISTRICT JUDGE